**[Cite as *Trent v. DeMange*, 2024-Ohio-5234.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| BRIAN TRENT dba TRENT AUTOMOTIVE SERVICES | : | |
| | : | |
| | : | C.A. No. 2024-CA-4 |
| Appellant | : | |
| | : | Trial Court Case No. 22CV00359 |
| v. | : | |
| | : | (Civil Appeal from Common Pleas |
| ANGELA M. DEMANGE, et al. | : | Court) |
| | : | |
| Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 1, 2024

. . . . . . . . . . .

MICHAEL C. LIND & BLAKE R. MAISLIN, Attorneys for Appellant

GERALD V. SOUTHARD, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Brian Trent, dba Trent Automotive Services ("Trent"), appeals from a summary judgment in favor of Phelan Insurance Agency, Inc. ("Phelan Insurance") and

Angela DeMange, a Phelan Insurance account manager (collectively, "Defendants") on Trent's claims for negligence/negligent procurement of insurance, negligent misrepresentation, vicarious liability, and breach of fiduciary duty. For the following reasons, we conclude that this matter was not properly resolved by way of summary judgment on the negligence claims. Because genuine issues of material fact precluded summary judgment on Trent's negligence claims, summary judgment in favor of Phelan Insurance on a theory of respondeat superior was also inappropriate. The matter will be reversed and remanded for further proceedings consistent with this opinion.

## Facts and Procedural History

{¶ 2} In May and June 2022, Trent contacted Phelan Insurance about obtaining coverage for an auto repair and towing business he was organizing. He dealt primarily with DeMange, who worked at Phelan Insurance. As a result of his contacts with DeMange, Trent believed that insurance had been obtained on his behalf, when in fact, it had not. A fire destroyed many of Trent's assets related to the business and the building in which Trent intended to house the business on June 24, 2022. Thereafter, Trent learned that he had no insurance coverage.

{¶ 3} Trent filed his complaint against Defendants on August 19, 2022. According to the complaint, Trent was the manager and owner of an automotive repair business in Greenville, Ohio. He asserted that Phelan Insurance had failed to procure insurance coverage for his business in an amount not less than $250,000. Specifically, Trent alleged that DeMange had assumed the duty to provide and procure adequate insurance coverage for his business, that she failed to do so, and that her failure to do so had

resulted in uninsured damages due to the fire at the business. Trent asserted that Phelan Insurance was vicariously liable for DeMange's negligent acts and omissions.

{¶ 4} Defendants filed a motion for summary judgment on September 12, 2023, arguing that Trent could not satisfy his burden of persuasion on any of his four causes of action as a matter of law. According to Defendants, DeMange's authority to act on Trent's behalf had been limited and, without his express authority, she could not endorse insurance agreements for him. They asserted that, because DeMange was entitled to summary judgment, liability could not attach to Phelan Insurance.

{¶ 5} The parties agreed that Trent would have until November 15, 2023, to respond to the motion for summary judgment. On that date, Trent filed a memorandum in opposition to Defendants' motion for summary judgment and his own motion for summary judgment on the issue of liability. He included an affidavit from an expert witness. On December 6, 2023, Defendants filed a motion to strike Trent's motion for summary judgment on liability and replied to Trent's memorandum in opposition to their motion for summary judgment. Defendants argued that DeMange only had agreed to procure insurance quotes for Trent, not insurance coverage, that Trent had failed to identity a cognizable misrepresentation, and that Trent had failed to present evidence of damages. Trent opposed the motion to strike.

{¶ 6} On December 14, 2023, the court granted Defendants' motion to strike, noting that it had set a deadline of September 22, 2023, for dispositive motions, but Trent had filed his motion for summary judgment and memorandum in opposition to Defendants' motion for summary judgment on November 15, 2023. The court stated that

Trent's filing would be considered only as it related to Trent's opposition to Defendants' motion for summary judgment. The trial court granted summary judgment in favor of Defendants on February 20, 2024.

{¶ 7} Trent raises three assignments of error on appeal. Before addressing Trent's assignments, we will review the evidence the trial court considered relevant to summary judgment, which consisted of the deposition testimony of Trent, DeMange, and Karen Thobe, an employee of Phelan Insurance who worked with DeMange regarding Trent's request for insurance. We will also review the trial court's decision granting summary judgment.

**Deposition Testimony**

Angela DeMange Deposition

{¶ 8} DeMange was an account manager at Phelan Insurance at the time of this dispute, with 27 years of insurance experience; she was licensed by the State of Ohio and had completed continuing education training. DeMange had been designated as a customer service insurance representative at one time but had allowed that designation to expire.

{¶ 9} DeMange testified that Karen Thobe, a sales executive at Phelan Insurance, had answered Trent's call after the fire at his property. She further stated that Karen Keiser, a sales executive at Phelan Insurance who had retired on July 1, 2022, had helped DeMange "with this one." According to DeMange, if Keiser had not retired, Keiser would have "taken and ran with" Trent's initial contact with Phelan Insurance "because it's a specialty class," which was Keiser's "area of expertise." DeMange identified numerous

emails between her and Keiser about Trent's obtaining a policy. According to DeMange, Keiser had "mostly wrapped up her own business" ahead of her retirement and had offered to help DeMange with anything she needed; in reply, DeMange had asked Keiser if she could fill out Trent's application with the information that she had obtained.

{¶ 10} Trent had been referred to DeMange by Lisa Cano, who had her own independent agency with State Farm. DeMange spoke to Trent between May 27 and June 17, 2022, but DeMange was unsure of the exact date. According to DeMange, she thereafter attempted to reach Trent by phone "multiple times" without an answer, but she did not document any of her attempts to reach Trent.

{¶ 11} DeMange testified that Cox Specialty Markets ("Cox") and W.N. Tuscano Agency ("Tuscano") were insurance brokers, and each represented several companies from which they could get insurance quotes. According to DeMange, brokers "cannot go directly to the customers," but agents can. Insurance quotes for Trent were sought from both brokers. DeMange explained that "generic" applications were completed for each broker to obtain a quote; they were "not going to fill out every company's application" because of uncertainty about which company would give the best quote. The generic application "seem[ed] to be the most comprehensive to answer all the questions that most brokers may ask."

{¶ 12} Keiser filled out the majority of the applications, and then, "at the last minute," because Keiser was getting ready to leave, DeMange "filled out the remaining few questions." Keiser sent the applications to the brokers on June 17, 2022, after DeMange obtained answers from Trent to "just a few questions." DeMange

acknowledged that the applications reflected a "proposed effective date" for the insurance of "asap," and she testified that it was her understanding that Trent "didn't have insurance yet."

{¶ 13} DeMange knew that Trent had prior automotive services experience with his father, but it was also her understanding "that he was maybe doing this for some time on the side." DeMange stated that they needed to provide "prior loss runs" to the insurance companies, which meant "prior experience showing no claims or showing claims" in order to obtain binding coverage; she testified that they would have to provide three to five years of loss runs, but Trent had no loss runs. Trent's application noted that he had managed his father's business, Trent Auto Parts, for 35 years, to reflect his experience. DeMange testified that new ventures were "not something that standard markets want to have," which was why they went to the brokers. According to DeMange, because it was an "E&S market" (excess and surplus lines market), it was a market that was "not favorable to standard markets." According to DeMange, "[w]e have to go to a specialty market to get coverage for this." She testified that she couldn't "imagine having a business started on day one without having insurance." When asked why not, DeMange responded, "for the exact same reason that just happened" here.

{¶ 14} DeMange identified a document dated May 27, 2022, which she had typed. It stated:

Talked to Brian [Trent]. He wants liability only on wrecker and rollback.

The on-hook value $75,000 and impound lot amount of 75,000 are both fine.

He thinks he'll be ok with Garagekeepers at $100,000 limit as well. The

RC building of $66,000 should be ok but he did make a note that he just put a $12,000 furnace in bldg. Contents $5,000. [T]ools $150,000. He has two bolted down attached hoists with a combined limit of $9,000. A movable brake hoist of $4,000. He has an alarm system around the impound lot/building with cameras and lights that are on 24/7 (made a note that it was entirely lit at night)[.] No b'shop work.

{¶ 15} DeMange identified an email from Keiser to her, dated June 7, 2022, requesting additional information from Trent, and she testified that she (DeMange) "would have physically . . . called" Trent to get that information. When asked what she told Trent after obtaining that information, DeMange responded, "that's a loaded question," and "I know I would have said we'll send it in, I will let you know what we find once we get a quote." On June 17, 2022, she sent Keiser the additional information requested by email.

{¶ 16} DeMange stated that Cox sent a proposal to Keiser on June 20, 2022. She identified the proposal from White Pine Insurance Company ("White Pine"), dated June 20, 2022, with a policy premium of $7,495 for the year and $1,639 required to bind the policy. Tuscano did not provide a proposal.

{¶ 17} On June 20, 2022, Keiser emailed DeMange stating: "I think we wait for Tuscano, who also has a good garage plan as this one: 7495.00." The email noted that Tuscano was an "A-rated company versus a B-rated company," with "better financial stability," and indicated that "we expected that one of Tuscano's companies would come back probably a little higher in premium, but much more coverage." DeMange also noted

that, if Trent had accepted the White Pine policy, he could not change his mind a week or two later if Tuscano provided a better quote and change to Tuscano, "because he would have had a 25 percent earned premium." In other words, "once [Trent] picked a company, he was pretty much locked into that, at least for three months," because "25% premium" meant that Trent would lose 25% of the premium he paid if he cancelled within three months, but if he waited three months into the policy period and then switched coverage, "there would be no additional cost to him with the exception of the fees and the buyout."

{¶ 18} DeMange attempted to contact Tuscano on July 18 or 19, 2022, before she left on vacation, a month after the initial contact with the broker. She was out of the office from July 20 through July 26, 2022.

{¶ 19} DeMange sent a July 19, 2022 email to Thobe and two other Phelan Insurance employees with a subject line "while I'm out." The email stated in part: "New Business: Trent Automotive Services: Quote in from Tuscano… Looks like a good quote but need to verify all of the coverages have been quoted. (Most pages blank) I left a voice mail message for the company as well as Brian Trent." DeMange acknowledged that she mistakenly identified Tuscano, instead of Cox, in the email.

{¶ 20} DeMange testified that, "in a lot of the E&S situations it just takes time" to receive a proposal and that "certain types of insurance take longer than others." She testified that it "depends on our brokers," what markets they have, and what type. DeMange stated that garage service "takes out several companies" that would normally quote it when you have just towing. She expected that Tuscano "would have been a

player" based upon her past experience. DeMange understood that the reason Phelan Insurance did not receive a quote from Tuscano in a timely manner was that someone had left Tuscano and "the ball got dropped on their end."

{¶ 21} DeMange "had rehearsed" what she was going to relay to Trent about waiting for a response from Tuscano, but she got no answer when she called him. Her practice when she was unable to reach someone by phone or to leave a voicemail was to call two or three times to display her number on the other person's phone.

{¶ 22} DeMange testified that she had not been Trent's agent; he was "a prospect" who had requested an insurance quote and not a client. According to DeMange, several things needed to be done before they could "bind coverage," including getting a signed application and money, neither of which they had gotten. She stated that the company handled prospects and customers or clients in "two totally different" ways, including having "a signed contract and agreement with . . . customers." When questioned at her deposition about the lack of documentation that she had told Trent that he only had to pay $1,639 to bind the Cox/White Pine policy, DeMange stated that that "would have been part of the conversation" she would have had with him when she "tried to get a hold of him and was not successful." She reiterated that he was not a client, just a prospect.

{¶ 23} DeMange testified that the binding instructions included in the White Pine proposal would have been discussed with Trent had she gotten through to him. She spoke to Trent before they received the quote and she tried to reach him on at least two occasions thereafter, one of which would have been very close to July 19, because she was leaving on vacation; she did not recall the other date. DeMange stated that Trent

did not have email, but that Phelan Insurance usually dealt a lot with email because it provided documentation in writing that could be reviewed.

**{¶ 24}** On July 28, 2022, Karen Thobe sent an email to DeMange noting that Trent had reported the fire. The email stated that Trent was "upset" and "wondering why he did not get a quote yet." Thobe sent another email to DeMange on July 30, 2022, which stated that Thobe had advised Trent that the agency had received a quote but had been "waiting on another option." He asked why they didn't call him with the quote "because – he would have paid for it – he has the money." Thobe's email stated that she had apologized that they didn't send the quote, but noted that, per DeMange's email, she had left a voicemail and Trent had not called back. In response, Trent had stated that he didn't "have his phone set up to take voice mail."

**{¶ 25}** DeMange testified that she was "surprised" that, if Trent had wanted insurance to be set up as quickly as he claimed, he had not been "badgering" her; because he did not call back, "it is an assumption that he is going with another agent." According to DeMange, if he had called at any time, she would have given him an update on the situation, but "[d]uring that time, he never once called" her. According to DeMange, she had to assume it was "more likely" he was using another agent, but because she had not been able to reach him, she was "going to keep working on it."

### Karen Keiser Deposition

**{¶ 26}** Karen Keiser testified that her last day at Phelan Insurance was July 1, 2022, after 49 years with the agency. She was an account manager for her last 30 years, working with commercial customers. Keiser handled "quite a few garage policies" and

had her own customers that were "garage customers." Trent was referred directly to DeMange, so it was "a new piece of business" assigned to DeMange. As Keiser was preparing to leave Phelan Insurance and winding down her own business, she offered to help other account managers; in response, DeMange asked her to work on Trent's garage application, and Keiser transferred the information DeMange had obtained from Trent onto an application. Keiser never spoke with Trent directly. According to Keiser, she started the work but gave it back to DeMange at a point where more information was needed to go forward.

{¶ 27} Keiser testified that, after an initial application is completed, it is sent to either an insurance company or an E&S market, a quote is obtained, and then there is a point at which the information obtained is discussed with the customer. If the customer wants to proceed, the agent then has to complete an application "specific to the insurance company that quoted." She stated the conversation with the customer may be by phone or in person, but in the end, the customer "has to see the application, be able to make changes, corrections, sign it and date it, make a payment."

{¶ 28} Keiser stated that she had filled out Trent's application as best she could and then she put it back on DeMange's desk with some notes about missing information. DeMange then obtained additional information and gave it back to Keiser. Keiser then sent the application to Cox and Tuscano. It was Keiser's practice to send an application to at least two companies, so there would be "some comparison on coverages and rates." She knew that Cox would be fairly quick in giving a quote, and Tuscano would probably take a little bit longer. Upon receipt of the Cox proposal, Keiser emailed it to DeMange.

**{¶ 29}** Keiser testified that Phelan Insurance's business practice was to maintain files regarding insurance business activity by means of "an agency management system," which allowed agents to type notes regarding a file or attach documents to it, such as applications or an emails between the agent and the insurance company, which were then kept with a particular customer, client, or prospect's file.

**{¶ 30}** Regarding an "ASAP" notation that was made on Trent's applications, Keiser stated that she'd talked with many underwriters who told her that, if they get an application that's blank as to when coverage is needed, it "goes to the bottom of their stack." Agents don't want that to happen, so she put "ASAP" on the applications in hopes that the underwriters would work on it quicker than one that was dated 30 days out or 20 days out. Keiser understood that Trent was "starting up a new business in the future" and was looking for a quote. DeMange did not give Keiser a date by which coverage was needed, and Keiser did not know if Trent had coverage with another agent. Keiser testified that she was not involved with the Trent application after she provided the White Pine quote from Cox to DeMange.

**{¶ 31}** Keiser's practice had been to review a quote with a customer or prospect after it was received to see if there was anything else that was needed. Keiser did not know if DeMange had done so with Cox's quote for Trent. Regarding DeMange's July 19, 2022 email indicating that she had left voicemails for Cox and Brian Trent, Keiser stated that she knew DeMange had had trouble reaching Trent, but Keiser did not "know the details of that."

Brian Trent Deposition

{¶ 32} Trent testified that his family owned a 75-year-old, third-generation auto business.   In 2022, he sought to insure "Trent Automotive Services," which he "was just starting to get going, so [he] was getting all [his] ducks in a row."   Trent's intention was to set up an LLC, because it was "just going to be [his] personal business."   Trent worked with the Ohio Department of Transportation (DOT) to get his "numbers," and he needed insurance to get that finished.   He then needed to get his "numbers" from PUCO (the Public Utilities Commission of Ohio) and a tax identification number.

{¶ 33} According to Trent, the business "was mainly going to be a wrecker service." He intended to provide towing, storage, and light repair services.   Trent resided with his wife in a home on the same property as the business, which was in a 35- by 55-foot barn on the property.   Trent had prepared the space by installing hoists, "220 hookups for welders," a new furnace, and a third garage door in the barn; he had a total of three bays, He had also purchased a 1989 Chevrolet "wrecker," which was insured.   According to Trent, he had access to a "4300 rollback" that was also insured at the time of the fire. Trent Automotive Services did not have a designated business phone, as Trent intended to use his cell phone for the business.

{¶ 34} Trent anticipated first performing work as Trent Automotive Services within 30 days of when he "had [his] DOT cleared," because everything else could be done within 30 days.   He stated that "DOT won't clear" unless he had insurance.   Trent stated that the barn was insured from around "November/December/January of '20 or '21" until the policy was canceled because of an electrical fire in the house.   "Nobody would touch

the property until the house was taken down." Trent and his wife settled the claim on the house for $200,000. At the time of the deposition, his home was insured by State Farm.

{¶ 35} Trent had been referred to Phelan Insurance by Lisa Mote of State Farm. He spoke to DeMange on his cell phone, and they discussed his need for insurance for his intended "wrecker and towing service and light service." DeMange told Trent she would look into some things and get back to him, because she would need answers to more questions. With regard to the initial phone call, Trent testified that he had specified that he wanted "[b]usiness insurance on that wrecker for when [he] had it or on the rollback for when [he] had it and the light service work and that property." Trent did not recall if he told DeMange on their first call specific when he would needed insurance, and he did not know at that time a specific date when Trent Automotive Services would commence business.

{¶ 36} Trent estimated that he next spoke to DeMange when he returned her phone call two to four weeks later, when she needed more information about what he needed. He testified that the second conversation was "probably getting a little more distinguished" on what kind of coverages he needed. In this phone call, Trent still did not tell DeMange a date by which he needed to have the insurance.

{¶ 37} Sometime thereafter, a third conversation occurred when Trent returned another call from DeMange; DeMange needed information about the value of tools, what tools he already had, the dimensions of the building, and whether it was fenced in. According to Trent, he "may have said" he had a deadline for insurance sometime during that third conversation because he had to have insurance for DOT. He did not remember

the date of the third conversation, noting that he is "not good with dates."

{¶ 38} Trent testified that he called Phelan Insurance "when it was getting close, within two to three weeks"; he did not get to talk to DeMange that time. He did not recall the date of this fourth call, but he stated that he probably spoke to whomever answered the phone at the front desk and advised that DeMange needed to call him back because he was "close to a deadline" and needed something.

{¶ 39} Trent testified that he called a fifth time and spoke to DeMange "within 10 days of when [he] had to have that DOT," and he gave her a definite date for needing insurance. Trent could not remember the exact date he provided to Demange, but he recalled that he "definitely told her what day it was." According to Trent, DeMange responded, "I've got it handled," and she said she would get back to him.

{¶ 40} Trent called Phelan Insurance a sixth time soon after the fire, at which time DeMange was on vacation. He did not remember the name of the woman to whom he spoke at the agency. Trent testified that the woman stated that she would look through DeMange's desk and see if she could "find it" (presumably his file). After a little while, the woman reported to Trent that she had found it "in another company's file." Trent testified, "I know I told her . . . I needed to have this or did she get this done." According to Trent, the woman stated that did not "get this done" and "that she really dropped the ball on this one." Trent learned that he did not have any coverage, whereupon he thought he "was just plain screwed."

{¶ 41} Trent did not communicate with Phelan Insurance by means of email, text, written correspondence, or in person at any time. He did not submit any documents to

the agency or communicate what he was willing to pay for the insurance. Trent testified that it was his practice to review his phone for missed calls and then return them; his phone was not set up to receive voice mail. Trent had not contacted other agencies for insurance coverage on his business because Phelan Insurance had previously insured his father's business, had "a good reputation," and had done a good job in the past.

{¶ 42} Trent testified that, over the course of his contact with DeMange, they had discussed his assets and what coverages he wanted. He advised her that he had had $150,000 or more in tools at the time of the fire and had probably had at least 95% of those before he contacted Phelan Insurance. When asked again when he had advised DeMange about a definitive date for needing insurance coverage, Trent replied that it was "[a]t least by the third" conversation and that due date was in his DOT files. Trent said that he advised DeMange that he had to have insurance documentation for the DOT, and she responded that she would "get working on it" and "should be able to get that taken care of." Trent testified that he advised DeMange "right off the get-go" that this property was not insured because of the condition of the house and he had to have insurance.

{¶ 43} Trent was asked if he gave DeMange or anyone else at Phelan Insurance the authority to bind insurance on his behalf, he stated that his understanding was that, when he told DeMange he had to have it "by this day, in [his] opinion that's telling her you do what you need to do to get me insurance." When asked if he told DeMange, "do whatever you want, accept any policy or quote that you want on my behalf," Trent responded, "Same thing again, I need insurance by this day." Trent testified that he told DeMange that he had the money in his bank account to pay for insurance and he would

"be there in the time it [took him] to get to Greenville" to bring a check if that's what was needed; "That means I'm buying the damn insurance, I want insurance now." Trent opined that "[r]easonable insurance should have been somewhere between five grand and ten grand" for a year. He acknowledged that he had never paid a premium or completed an application.

{¶ 44} Trent testified that the Greenville Fire Department had investigated the cause of the fire at the barn. He stated that it occurred when he started the engine after he had accidentally left a fuel line unhooked on one of his vehicles in the barn.

{¶ 45} Trent denied that he had seen the Cox quote, which would have covered the building for $75,000 limit with $1,000 deductible. In Trent's opinion, $75,000 probably would not have been sufficient to cover the barn "at today's rates," "put back as is." The quote was for actual cash value (ACV), but Trent testified that he would have wanted replacement value, not ACV. When asked if he would have accepted the Cox quote, Trent said he "probably would not have" done so, because he "would have been losing, . . . would have been a complete loss."

{¶ 46} When asked if he believed that coverage for Trent Automotive Services could be been bound without his review of a quote, Trent responded that he was told "that it would be handled," which he interpreted "as she had me covered and I just needed the dollar amount to come pay," because he and DeMange had reviewed what tools he had and what coverage he wanted, so she "had all the info she needed." When asked if he thought coverage would have been bound without his signing an application, Trent responded affirmatively, noting that he doesn't have to sign anything when he puts a car

on his insurance policy.

{¶ 47}  At the end of the deposition, Trent's attorney asked him whether he'd known the difference between actual cash value and replacement value with respect to insurance before the questioning during the deposition.   Trent testified that he had not and that neither DeMange nor anyone else at Phelan Insurance had explained it to him.  He reiterated that he would have wanted replacement value if he had understood the difference, but no one had discussed it with him

**Trial Court Decision**

{¶ 48} The trial court initially concluded that there was no fiduciary relationship between DeMange and Trent, only an ordinary business relationship.   It was significant to the court that Trent and DeMange had only spoken on the phone a few times over a period of three months before DeMange she was informed of Trent's call to Phelan Insurance about the fire at his property.   The court concluded that, as a matter of law, an ordinary business relationship was insufficient to support liability for breach of fiduciary duty.   Thus, there was no genuine issue of material fact as to breach of fiduciary duty.

{¶ 49} Regarding Trent's claim for negligent procurement of insurance, the court found that there was no genuine issue of material fact as to whether DeMange had had the requisite authority and consideration to procure insurance on behalf of Trent, citing *Soehnlen v. Fabe,* 1992 WL 68663 (10th Dist. Mar. 31, 1992).   The court observed that it was undisputed that DeMange had obtained neither Trent's signature nor any consideration from him.   Moreover, the White Pine proposal stated, "This is not a binder. No coverage may be considered bound until confirmed by the company," and the

proposal set forth additional steps to bind coverage. The trial court concluded: "Clearly, additional information and documentation [were] required from [Trent] before binding coverage could be obtained from White Pine." Therefore, the trial court concluded that, as a matter of law, there was no genuine issue of material fact that DeMange could be liable for "failing to bind coverage" on Trent's behalf.

{¶ 50} With respect to the claim for negligent misrepresentation, the trial court determined that there was a genuine issue of material fact as to whether a misrepresentation had occurred, but that Trent could not prove damages. The court first noted that DeMange "had a pecuniary interest" in the transaction as an employee of Phelan Insurance. However, as to other elements of negligent representation, the court found that there were genuine issues of material fact related to the information and communication provided by DeMange to Trent, whether there had been a breach of duty of care relating to such information and communication, and whether Trent had been justified in his reliance on such information. In the court's view, the crux of the matter was whether DeMange's statement to Trent, on or before June 17, that she had "got it handled" was reasonably interpreted by Trent to mean that she had entered an insurance contract on his behalf. The court posulated: "What did Ms. DeMange mean by this statement? What did [Trent] believe this statement meant? What would a reasonable person's understanding be of this comment? All of these questions and others, require a trier of fact to analyze the communication, information, relationship of the parties, and credibility of the witnesses."

{¶ 51} However, the court concluded that Trent could not, as a matter of law,

present sufficient evidence that was "not merely conjecture or speculation" regarding his damages on this claim. The court noted that had Trent sought coverage "for his two tow trucks, $75,000 coverage for his impound lot, $66,000 for his barn, $5,000 for contents and $150,000 for tools." Yet in his pretrial statement, Trent estimated damages at $55,935.27 for vehicle loss; $252,578.79 for structural loss; and $150,174.07 for the contents of the barn. Citing *Fischer v. State ex rel. Warren Star Theatre,* 84 Ohio App.3d 435, 442 (11th Dist. 1992), the trial court concluded that the proper measure of damages was "what the insurer would have owed under the terms of the insuring agreement had a policy been executed" prior to the alleged loss. The trial court found that Trent would have been required to establish that the amount of coverage to which he would have been entitled and that the alleged loss would have been covered. But "the only evidence tending to show the amount of coverage" to which Trent *might* have been entitled was the White Pine proposal, which required additional information from Trent and further evaluation and verification by White Pine before he would have been entitled to coverage. Finally, it was significant to the court that Trent testified that he would not have accepted the coverage terms in the White Pine proposal. "[W]ithout record evidence from which a trier of fact can determine the amount of [Trent's] damages beyond mere conjecture or speculation, [Trent] cannot, as a matter of law, satisfy all elements of his claim for negligent misrepresentation."

{¶ 52} In sum, the court found there was "no genuine issue of material fact sufficient to maintain [Trent's] primary causes of actions – negligent procurement of insurance (Count I), negligent misrepresentation (Count II), and breach of fiduciary duty

(Count IV)," and as such, there was no claim by which Phelan Insurance could be vicariously liable in Count III.

{¶ 53} Trent appeals, raising three assignments of error. Trent's claim for breach of fiduciary duty is not at issue in this appeal.

**Assignments of Error and Analysis**

{¶ 54} Trent's first assignment of error is as follows:

THE TRIAL COURT ERRED IN CONCLUDING THAT NO GENUINE ISSUE OF MATERIAL FACT EXISTS WITH RESPECT TO PLAINTIFF'S CLAIM THAT DEMANGE NEGLIGENTLY FAILED TO PROCURE INSURANCE.

Arguments

{¶ 55} Trent argues that the trial court failed to consider the testimony of his expert witness, Louis G. Fey, Jr., and "relied on case law inapplicable to this matter," namely *Soehnlen v. Fabe,* 1992 WL 68663 (10th Dist. Mar. 31, 1992). Relying on Fey's affidavit and report, he asserts that he established that DeMange "owed a duty of care to procure . . . insurance in a timely and reasonably diligent manner."

{¶ 56} Trent argues that genuine issues of material fact also existed regarding DeMange's breach of a duty owed to him, because she advised him that the matter was "handled," but when he called to report the fire and talked with someone else because DeMange was on vacation, that person informed him that DeMange "had really dropped the ball." Trent points out that DeMange had received the White Pine proposal on June 20, 2022, more than a month before the fire, but had not presented it to him. Trent

argues that it cannot reasonably be disputed that DeMange's breach proximately caused his damages.

**{¶ 57}** According to Trent, *Soehnlen* is distinguishable because it was decided within the context of the Ohio Fair Plan, which is distinct from ordinary commercial insurance. He argues that the "additional requirements" to bind coverage with White Pine were all actions that DeMange either needed to take herself or needed to ask Trent to take in order to bind coverage.

**{¶ 58}** Defendants respond that Trent could not succeed on a claim of negligent procurement of insurance because the record reflected that DeMange did not have the authority to bind insurance coverage or to accept White Pine's offer. Defendants also argue that Trent did not challenge their assertion in the trial court that he could not establish the element of damages in relation to his claims in negligence – both negligent procurement of insurance or negligent misrepresentation – and as such he waived such arguments for appeal. Defendants assert that Trent misconstrues *Soehnlen.* Finally, they argue that "only White Pine could assent to binding coverage," even if the additional information had been provided to White Pine.

**{¶ 59}** Trent responds that Defendants did not "meaningfully challenge [his] law and/or facts" in support of his arguments that DeMange had owed him a duty to exercise good faith and diligence in acquiring insurance for his business, had breached that duty by failing to do so, and had proximately caused him significant financial harm. He contends that the White Pine offer made clear that coverage could begin before payment was received. Trent asserts that any argument that DeMange could not bind insurance

is unavailing and that, rather than do so, she misplaced his file and went on vacation after telling him it was "handled." He asserts that DeMange can be held liable if her conduct caused an unreasonable delay, and that we should reject the argument that DeMange lacked the requisite authority or consideration to bind coverage. Trent asserts that he did not waive his negligent procurement claim and that there were genuine issues of material fact with respect to whether DeMange's failure to procure insurance proximately caused "damages equal to the amount of coverage . . . in the White Pine offer."

Standard of Review

{¶ 60} Pursuant to Civ.R. 56(C), a movant is entitled to summary judgment when that party demonstrates that there is (1) no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the non-moving party. *Rhododendron Holdings, LLC v. Harris*, 2021-Ohio-147, ¶ 22 (2d Dist.). "The burden of showing that that no genuine issue exists as to any material fact falls upon the moving party requesting a summary judgment." *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66 (1978). Once the moving party has satisfied its burden of showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The nonmoving party cannot rely upon the mere allegations or denials in the pleadings but must give specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *accord Geloff v. R.C. Hemm's Glass Shops, Inc.*, 2021-Ohio-394, ¶ 14 (2d Dist.). When the standard is met, summary judgment must be awarded as a matter of

law.    We review the trial court's ruling on a summary judgment motion de novo. *Schroeder v. Henness*, 2013-Ohio-2767, ¶ 42 (2d Dist.).

**{¶ 61}** Civ.R. 56(C) lists competent material that may be considered when ruling on a motion for summary judgment.    "All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made."    *Minor v. Allstate Insurance Co.*, 111 Ohio App.3d 16, 19 (2d Dist. 1996), citing *Morris v. First Natl. Bank*, 21 Ohio St.2d 25 (1970).

Negligence/Negligent Procurement of Insurance

**{¶ 62}** A "person has an insurable interest in property when, '. . . he would profit by or gain some advantage by its continued existence and suffer some loss or disadvantage by its destruction.' "    *Gerace-Flick v. Westfield Natl. Ins. Co.*, 2002-Ohio-5222, ¶ 79 (7th Dist. 2002).

**{¶ 63}** "The elements of a negligence claim are (1) the existence of a duty owed by the defendant to the plaintiff, (2) the breach of duty, (3) causation, and (4) damages." *Robson v. Quentin E. Cadd Agency*, 2008-Ohio-5909, ¶ 19 (4th Dist.), quoting *Carpenter v. Scherer-Mountain Ins. Agency*, 135 Ohio App.3d 316, 326 (4th Dist. 1999), citing *Anderson v. St. Francis-St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84 (1996).    "In the context of a negligence claim, duty is the threshold issue."    *Kumar v. Sevastos*, 2021-Ohio-1885, ¶ 28 (8th Dist.).    "Where there is no duty, there can be no negligence."    *Id.* Whether the defendant owed a duty to a plaintiff is a legal question that depends upon the foreseeability of the plaintiff's injury.    *Robson,* quoting *Carpenter,* citing *Menifee v. Ohio Welding Products*, 15 Ohio St.3d 75, 77 (1984).    "An injury is foreseeable if a

reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Id.*

{¶ 64} "In the insurance context, an action for negligence may be based upon an insurance agent's failure to procure insurance." *Id.,* quoting *Carpenter*, citing *Minor,* 111 Ohio App.3d at 21 (2d Dist.). "An insurance sales agency has a duty to exercise good faith and reasonable diligence in obtaining insurance which its customer requests." *First Catholic Slovak Union of the United States and Canada v. Buckeye Union Ins. Co.*, 27 Ohio App.3d 169, 170 (8th Dist. 1986).

{¶ 65} "An agent will be held liable if, 'as a result of his or her negligent failure to perform that obligation [to procure insurance], the other party to the [insurance] contract suffers a loss because of a want of insurance coverage contemplated by the agent's undertaking.' " (Brackets in original.) *Robson* at ¶ 19. "If an insurance agent's negligence results in coverage less than that desired by an insured, the agent will be liable for the amount the insured would have received had the correct coverage been in place." *Id.*

{¶ 66} "Such a failure has been found where the type of coverage or the amount procured was less than that desired by the insured." (Citation omitted.) *Minor* at 21. "In that event, the extent of the agent's liability is the amount the insured would have received from the insurer had the coverage been placed." *Id.* When "the agency knows that the customer is relying upon its expertise, the agency may have a further duty to exercise reasonable care in advising the customer." *First Catholic Slovak Union* at 170. "Whether an agent has negligently failed to procure insurance is ordinarily a question of

fact." *Minor* at 22.

Analysis

**{¶ 67}** Initially, we agree with Trent that *Soehnlen,* 1992 WL 68663 (10th Dist.) is distinguishable, because at issue in that case was whether the insurance agent involved in the procurement of the fire coverage "had authority to receive payment on a credit basis for the insurer and thus bind the risk." *Id.* at *1. Soehnlen owned a restaurant and sought insurance coverage through his longtime agent, Michael Rapacki, who was employed by an insurance agency. *Id.* Although unfamiliar with the Ohio Fair Plan, Rapacki obtained a year-long fire insurance policy through Ohio Fair Plan for his restaurant in 1986. *Id.* Soehnlen also insured the restaurant for the following year with Ohio Fair Plan with the assistance of Rapacki and his agency. *Id.* at *2.

**{¶ 68}** In 1988, Soehnlen decided to have Rapacki continue coverage for the restaurant with the Ohio Fair Plan. *Id.* The restaurant was destroyed by fire that year. *Id.* at *1. Rapacki and Soehnlen learned after the fire that no premium had been sent to Ohio Fair Plan. Soehnlen relied upon "the continued credit arrangement that existed between Rapacki and Soehnlen to establish that the insurer effectively received payment of premium," while defendants asserted that neither Rapacki nor his agency had any authority to receive payment of the premium. *Id.* at *2.

**{¶ 69}** The Ohio Fair Plan at issue in *Soehnlen* was created in 1969 "to assure the availability of property insurance for property that is not otherwise insurable in the normal insurance market." *Id.* at *3. As "a condition of doing business in Ohio property insurers are compelled to be members of the association and underwrite risks that the

normal insurance market considers poor." *Id.*, citing R.C. 3929.43. Due to the "special nature and purposes of the statutory scheme, Ohio Fair Plan insurance is different from ordinary commercial fire insurance in several respects." *Id.* Ohio Fair Plan "is only authorized to underwrite policies for one year, thereby creating an incentive for poor risks to continually seek normal insurance instead of relying on the Ohio Fair Plan," and, accordingly, an insured must apply each year for the insurance. *Id.* The plan is further governed by "a special agency rule," which was contained in Ohio Adm.Code 3901-1-18(D)(2) when *Soehnlen* was decided but is now at Ohio Adm.Code 3901-1-18(E)(2). It states: "No licensed agent, although licensed to represent one or more member insurers of the association, shall hold himself out as an agent of the association *or have any authority to bind any risk for the association.*" (Emphasis added.) *Id.* Further, the warranty section of Soehnlen's original application for the Ohio Fair Plan Insurance stated: ". . . I (We) understand that the producer is NOT acting as an agent of the Ohio FAIR Plan or of any insurer for purposes of this application *and has no authority to bind insurance.*" (Emphasis in original.) *Id.* at *4.

{¶ 70} *Soehnlen* concluded that "Rapacki's limited scope of authority [was] significant," further noting that "a general agent for an insurance carrier has a wide range of duties and a corresponding wide scope of actual and implied authority." *Id.* at *4. Commonly, "a general agent has the authority, *inter alia*, to sign, issue, and deliver policies of insurance on behalf of the insurer." *Id.*, citing *Clements v. Ohio State Life Ins. Co.,* 33 Ohio App.3d 80, 84 (1st Dist. 1986). *Soehnlen* noted that the "great weight of authority . . . recognizes that general agents have authority to collect premium and even

grant credit as payment, so long as there are no known restrictions on such authority." *Id.*, citing *Newark Machine Co. v. Kenton Ins. Co.*, 50 Ohio St. 549 (1893). *Soehnlen* concluded that it was "undeniable and undisputed that, from the outset, these agents did not have the scope of authority of a general agent. Rather, they were expressly considered to be unable to bind risks on behalf of the insurer." *Id.*

{¶ 71} In *Clements*, which was cited in *Soehnlen*, applicants for insurance sued an insurance agent and insurer for breach of contract and negligence. The First District reversed the grant of summary judgment in favor of the defendants and remanded. *Clements* determined that the "unresolved issues pivot around the effective date of health and accident insurance for which plaintiffs applied to the insurance company through [the agent], the representations he is alleged to have made, and the binding effect of those representations, if any, on the insurance company." *Id.* at 81. The First District determined that many facts pertinent to the case were in dispute, most notably the allegations that the agent had represented to the Clementses that coverage would be effective immediately upon delivery of the premium check to him. *Id.* at 84.

{¶ 72} *Clements* stated that an "insurance agent who advises a client that the coverage sought is in effect with the knowledge that the insurance company has not yet agreed to provide the coverage thereby incurs personal liability as an insurer." *Id.*, citing *Stuart v. Natl. Indemn. Co.*, 7 Ohio App.3d 63 (8th Dist. 1982). Also, "if an agent is negligent in failing to acquire coverage he has undertaken to procure, he may be liable for resulting damage." (Citation omitted.) *Id.* According to the First District, "whether [the agent] told [the Clementses] they would be covered once the application was

completed and the premium paid as well as how quickly (on what dates) he acted upon their request for coverage" were "issues of fact material to these stated principles of law . . . not resolved in the cognizable documents." *Id.* Another necessary factual determination was whether the agent's conduct "entailed an unreasonable delay and thus constituted negligence." *Id.*

{¶ 73} *Clements* noted that "it is clear that an agent may contract on behalf of an insurance company to issue temporary coverage of an applicant pending processing of his application." *Id.* at 85, citing *Gettins v. United States Life Ins. Co.*, 221 F.2d 782 (6th Cir. 1955). "Such agreements are referred to as preliminary or temporary contracts or 'binders[,]' " which are often evidenced by written receipts, but may be oral, "in which case their existence must be proven by clear and convincing evidence." *Id.*, citing *Royal Indemn. Co. v. Goodman*, 32 Ohio App. 316 (8th Dist.1929).

{¶ 74} "Sometimes, the effectiveness of a binder or an agreement for temporary insurance is expressly conditioned upon the fulfillment of certain requirements, such as the completion of a medical examination, . . . or insurability under company rules, . . . or approval of the application." (Citations omitted.) *Id.* If the applicant, however, "is merely told he is 'covered,' and no time is specified for termination of temporary coverage, coverage commences immediately and continues for a reasonable amount of time for issuance of the policy." *Id.*, at 85-86, citing *Little v. Republic-Franklin Ins. Co.,* 1 Ohio App.2d 524 (3d Dist. 1965).

{¶ 75} *Clements* further noted that these rules "have been applied throughout Ohio case law in markedly particularized fashion, tailored to the precise facts underlying each

action." *Id.* at 86.   Indeed, "it is a rare event when a controversy over the existence of an insurance contract can be resolved by summary judgment."   *Id.*

**{¶ 76}** In Trent's case, the trial court concluded that his claim for negligent procurement failed for lack of authority on DeMange's part to bind insurance and lack of consideration from Trent, without addressing the actual elements of the negligent procurement claim.   The White Pine proposal stated at the top of the first page that the quote was valid for 30 days.   It further stated: "The coverages, terms and conditions offered in this quotation may be more restrictive and differ with the specifications submitted for consideration.   Please read this quote carefully and compare it against your specifications.   *Agent is responsible for discussing coverage forms and terms with the applicant.*" (Emphasis added.)

**{¶ 77}** The proposal also stated:

**BINDING INSTRUCTIONS: STEPS REQUIRED TO PURCHASE INSURANCE**

Should you wish to bind coverage, please complete the following steps:
1. Review the information on the quote for accuracy.   Incomplete and inaccurate information could affect your rate.
   These rates are subject to verification of information.
2. Request to start coverage in writing (FAX or Email) on or before the desired effective date.
3. Collect premium and indicate payment method.
4. Complete required applications and documents as indicated.

After we receive your request to bind, you will receive a binder or confirmation of coverage.
An invoice will also follow.   Please pay from the invoice by the due date shown.

**\*\*Your agency is responsible for all earned premium, taxes and fees.\*\***
**\*\*Advance premium for the insured at your own risk.\*\***

The proposal also included a list of required applications and documentation.

**{¶ 78}** As Trent asserts, the trial court did not appear to consider Louis Fey's expert report. Fey opined that Phelan Insurance had "accepted Trent as a client and agreed to procure coverage on his behalf." According to Fey, an insurance agent has the "basic obligation" to act diligently when asked by a client to procure coverage, and when an agent agrees to procure coverage, the agent "must do so in an expedient and diligent manner, or inform the client that he or she is unable to do so." Fey reasoned that, because Trent's property was uninsured, "time was obviously of the essence." Fey further opined that Phelan Insurance had failed to act in a diligent manner after agreeing to procure coverage for Trent, and that its failure to provide Trent with the White Pine quote prior to the fire was "careless and substandard," which left Trent uninsured at the time of the fire.

**{¶ 79}** Fey noted that Phelan Insurance attempted to excuse its failure to procure insurance coverage by arguing that it had been searching for better coverage, that Trent had failed to return phone calls, that Phelan Insurance had not known when Trent intended to commence its business, that Phelan Insurance had lacked authority to bind coverage, and that its interaction with Trent had been limited to a few phone calls. Fey opined that "[a]ny coverage would have been better than no coverage, and Trent was deprived of the opportunity to decide for himself if the White Pine quote was acceptable." Fey noted that Trent "quickly responded" when asked for additional information, resulting in the submission of the applications to White Pine and Tuscano. Fey further noted that, although Phelan Insurance has a system for documenting activity in the course of procuring insurance, there had been no documentation of DeMange's attempts to reach

Trent. It was significant to Fey that Trent's property was uninsured when he spoke to DeMange, such that the date Trent intended to commence operations was "moot." Fey opined that Phelan Insurance's failure to inform Trent of the White Pine offer prevented Trent "from being able to give [Phelan Insurance] the order to bind coverage" or to complete the additional requirements in the offer.

{¶ 80} Further, Fey opined that "limited interaction is a common practice in the procurement process, with coverage sometimes being bound during the first conversation," and that two months was "an extremely long time to place coverage on uninsured property." According to Fey, any suggestion that Phelan Insurance was not obligated to procure coverage because it had not yet been compensated by Trent was contrary to "the insurance industry's standard practice," and insurance premiums are paid "at or after binding." Fey noted that, typically, "insurance agents will give clients various options to pay premiums, such as cash, premium financing, or by mail via invoicing." Fey concluded that Phelan Insurance had failed to act in a "diligent, prudent, and reasonable manner after having agreed to procure Trent's insurance coverage." Fey had significant experience in the insurance industry and stated that the opinions set forth in the report attached to his affidavit were "expressed within a reasonable degree of professional certainty within the insurance agency."

{¶ 81} We conclude that the matter herein is not the sort of "rare event when a controversy over the existence of an insurance contract can be resolved by summary judgment." *See Clements*, 33 Ohio App.3d at 86 (1st Dist.). As in *Clements,* many facts are in dispute, and genuine issues of material fact remain regarding the existence of any

duty assumed by DeMange, any breach thereof, and whether any foreseeable damages proximately resulted.

**{¶ 82}** Although the trial court determined that Trent and DeMange had entered into an ordinary business relationship, construing the evidence most strongly in favor of Trent, genuine issues of material fact exist regarding the nature of their relationship. Fey characterized Trent as a "client" of Phelan Insurance, yet DeMange testified that she was not acting as Trent's agent and characterized Trent as merely a "prospect." Keiser's testimony at least suggested that there is no distinction between a client and a prospect. Keiser noted, "if it were [her] customer or client or prospect," as a matter of course she would have reviewed any proposal obtained with the person seeking insurance.

**{¶ 83}** While the expressly limited scope of the agent's authority in *Soehnlen* was clear, we conclude that genuine issues of material fact exist here regarding the scope of DeMange's authority to act on Trent's behalf. In contrast to the trial court's determination that DeMange lacked consideration from Trent, the quote appears to at least suggest that DeMange may have had authority to pay the insurance premium "at [her] own risk." A reasonable juror may or may not conclude that DeMange had a duty to mail the proposal to Trent under these circumstances, instructing him to contact her to discuss its terms, knowing that Trent lacked email and voicemail (and insurance). Further, there is also a genuine issue about whether DeMange's conduct rose to the level of unreasonable delay, since the White Pine proposal expired without her ever having provided it to Trent for his consideration.

**{¶ 84}** Regardless of the definition of the relationship, Trent testified that he

believed that DeMange had "handled" the process of obtaining insurance for him; the trial court correctly found that genuine issues of material fact exist regarding the meaning of DeMange's statement and Trent's understanding of it. Notably, DeMange referred to Trent as "new business" in her "while I'm out" email, which was sent one day before the White Pine proposal expired. The trial court did not address the limited duration of the proposal. Given the inconsistent testimony between what DeMange believed Trent sought and what he believed she procured, genuine issues of material fact exist regarding whether DeMange had advised Trent with reasonable care.

{¶ 85} Under these specific facts, if a jury concludes that DeMange owed a duty to Trent, it must also determine whether she breached any duty to him between May 27, 2022, when she first spoke to Trent, and the expiration of the White Pine policy on July 20, 2022. We note that DeMange testified that she had assumed that Trent sought coverage elsewhere.

{¶ 86} Although it was significant to the trial court that Trent's testimony suggested he would not have accepted the White Pine proposal, Trent also testified that he had never seen the proposal. Thobe represented to DeMange that Trent was upset that he had not received the proposal and would have paid for it if given the opportunity, and Thobe represented to Trent that DeMange had left him a voicemail when Trent's phone could not accept voicemail. Trent stated he was told that DeMange had "dropped the ball."

{¶ 87} Finally, as to damages, by definition, a negligent failure to procure insurance claim involves the absence of an effective policy. Should a jury conclude that DeMange

owed a duty to Trent and breached that duty, it must also determine whether the White Pine proposal represents an adequate measure of damages. This issue will be discussed more fully in our analysis of Trent's second assignment of error.

{¶ 88} Construing the evidence most strongly in favor of Trent, as we must do, many genuine issues of material fact exist regarding Trent's claim for negligent failure to procure insurance. Accordingly, Trent's first assignment of error is sustained.

{¶ 89} Trent's second assignment of error is as follows:

THE TRIAL COURT ERRED IN CONCLUDING THAT MR. TRENT'S NEGLIGENT MISREPRESENTATION CLAIM MUST BE DISMISSED BECAUSE HE FAILED TO PRESENT EVIDENCE OF DAMAGES BEYOND CONJECTURE AND SPECULATION.

Arguments

{¶ 90} Trent asserts that the White Pine proposal listed specific coverages: general commercial liability of $2,000,000; coverage on the building up to $75,000; and coverage on business personal property up to $159,000. Therefore, he argues that these coverages, and therefore his damages, were not speculative. According to Trent, the record contained "all requisite facts regarding the requested coverage and the protection afforded by that coverage." He asserts that his testimony that he would not have accepted the policy was "irrelevant and a nullity," because he had been told by DeMange that everything was "handled" and, in his mind, he had accepted the coverages presented by DeMange in the proposal. Trent asserts that he "relied on DeMange to give him the information he needed, and then accepted the coverage she presented."

He argues that we should reject the trial court's finding that the insurance coverages were speculative and find that there had been a genuine issue of material fact with respect to whether DeMange negligently misrepresented that his coverage was "handled."

**{¶ 91}** Defendants respond that Trent waived his right to argue the issue of damages with respect to his claims of negligence, because he did not contest Defendant's position in their motion for summary judgment that Trent's negligence claims failed as a matter of law insofar as Trent could not establish what he would have been owed under the terms of the insurance agreement had a policy been executed at the time of the alleged loss. Defendants assert that the White Pine proposal did not establish the amount of coverage to which Trent would have been entitled, because the proposal was contingent on underwriting items, such as loss runs and inspection reports, which required further evaluation by White Pine before it would have agreed to bind coverage. Citing Trent's deposition testimony, Defendants argue that he not only understood the difference between actual cost value and replacement cost value, but that replacement cost value "provided the desired coverage sufficient to cover the costs to repair and/or rebuild after a potential loss." According to Defendants, there had been no agreement as to the exact terms of coverage, such that Trent's damage claim was mere speculation.

**{¶ 92}** In reply, Trent asserts that "the fact that some of the terms may have changed in underwriting and/or it is impossible to know exactly what items may have been covered" was not sufficient to warrant summary judgment. He asserts that common sense dictates that DeMange's negligence resulted in considerable financial harm to him, and the exact amount of the damages should be determined by the trier of fact.

Negligent Misrepresentation

{¶ 93} "A distinct cause of action for negligent misrepresentation lies against a party 'who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions.' " *Carpenter*, 135 Ohio App.3d at 328 (4th Dist.), citing *Delman v. Cleveland Hts.,* 41 Ohio St.3d 1, 4 (1989). "To be actionable, the negligent misrepresentation must result in the plaintiff's pecuniary loss caused by justifiable reliance on the information." *Id.*, citing *Leal v. Holtvogt*, 123 Ohio App.3d 51, 62 (2d Dist. 1998). "An insurance agent will be liable for false and fraudulent representations that the insured has relied upon to his damage." *Id.*, citing *Kungle v. Equitable Gen. Ins. Co.*, 27 Ohio App.3d 203, 206 (9th Dist. 1985). "The law of misrepresentation protects a plaintiff's interest in 'formulating business judgments without being misled by others into making unwise decisions which result in financial loss.' " *Id.* at 329, citing *Davidson v. Hayes*, 69 Ohio App.3d 28, 31 (9th Dist. 1990), citing *Miles v. Perpetual S.& L. Co.*, 58 Ohio St.2d 97, 99 (1979).

{¶ 94} "Unlike fraudulent misrepresentation, which requires intent to deceive, negligent misrepresentation only requires good faith coupled with negligence." *Marasco v. Hopewell*, 2004-Ohio-6715, ¶ 53 (10th Dist.), citing 4 Restatement of the Law 2d, Torts § 552 (1977). "Liability for negligent misrepresentation is based upon the negligence of the actor in failing to exercise reasonable care or competence in supplying correct information." *Id.* A " 'representation made with an honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts, or in the manner

of expression, or absence of the skill and competence required by a particular business or profession.' " *Merrill v. William E. Ward Ins.*, 87 Ohio App.3d 583, 590 (10th Dist. 1993), citing Prosser & Keeton, Law of Torts, Section 107, 745 (5th Ed. 1984). "The question of whether or not the actor used reasonable care in obtaining or communicating information is one for the jury, unless the facts are so clear as to permit only one conclusion." (Citation omitted.) *Marasco* at ¶ 53.

Analysis

**{¶ 95}** The trial court relied on *Warren Star Theatre*, 84 Ohio App.3d 435 (11th Dist.), in support of its determination that Trent could not prove damages on his claim of negligent misrepresentation. In that case, the State sued a nonprofit theatre corporation, Warren Star Theatre, and its president, Frank Kenley, for violations of the Consumer Sales Practices Act ("CSPA"). The claims arose after the theatre sold tickets for four summer performances. The first show was performed as advertised, the second show was cut short after the performer became ill, and the third show was cancelled prior to its scheduled run. The contractual fee for the fourth performance, half of which was payable a month in advance, was not paid, and the performer cancelled the contract. However, tickets were sold even after the advance fee was not paid. *Id.* at 437-38. Numerous customers were not refunded for cancelled performances. Warren Star Theatre "had no funds to make any refunds," and its president acknowledged that no customers had ever been informed of the theatre's precarious financial condition until the box office closed. *Id.* at 438.

**{¶ 96}** Warren Star Theatre and the Kenleys filed a third-party complaint against

their insurance agent, Richard Kelley, Insurance Intermediaries, Inc., and Scottsdale Insurance Company. They alleged that, although Kelley had obtained insurance for theatre operations, Kelley had negligently failed to obtain directors' and officers' liability coverage in that policy, as requested and paid for by Kenley. Kelley apparently believed that the directors' and officers' liability coverage had been included in the policy, and he was never notified that "the policy issued was inadequate in any respect." *Id.* at 439.

**{¶ 97}** The matter was referred to a referee. After a hearing, Kelley moved twice for a directed verdict, and his motions were denied. *Id.* The referee found that Warren Star Theatre and Kenley had "engaged in unconscionable acts and practices" in violation of the CSPA, but that Kenley could not be held personally liable for refunds due consumers; Warren Star Theatre was responsible for the refunds. *Id.* The referee further found that Kelley had been negligent in not obtaining directors' and officers' liability coverage as requested, such that Kelley was also "liable for any damages assessed against Warren Star because of the acts of its directors and officers." *Id.*

**{¶ 98}** Kelley filed objections, and the trial court adopted the report of the referee. *Id.* at 440. All parties appealed. In relevant part, Kelley argued that the referee had erred in overruling his motion for directed verdict. *Id.* at 441. The theatre and Kenley argued that, if Kelley had obtained directors' and officers' liability coverage as instructed, then "the third-party plaintiffs would have been able to avail themselves of that coverage and, thus, would have been shielded from liability"; they asserted that Kelley had been negligent in not obtaining the coverage or at least advising them that they were not covered. *Id.*

{¶ 99} The Eleventh District held that Warren Star Theatre and Kenley had failed to establish that the breach of duty owed them by Kelley was the proximate cause of the injury they suffered, because there "was no evidence presented that, had director's' and officers' liability coverage been in place, [they] would have been protected by said policy." *Id.* In other words, the plaintiffs failed to present any evidence that a claim presented to the insurance company under a directors' and officers' liability policy would have been "deemed meritorious," and they produced no evidence to establish what the terms of the directors' and officers' liability policy coverage that they had requested would have been. *Id.*

{¶ 100} The *Warren Star* opinion quoted the Eighth District's opinion in *Stuart v. Natl. Indemn. Co.*, 7 Ohio App.3d 63 (8th Dist. 1982), which stated: " 'Ordinarily, the measure of damages for tortious misrepresentation that insurance has been provided is the loss sustained by the failure to provide that coverage. In other words, the defendant sales agency and its president are liable for the amount the insurer would have owed under the terms of the supposed insurance contract.' " *Id.* at 442. *Warren Star* concluded that the Warren Star Theatre and Kenley failed to show not only that their actions would have been covered by a director's and officers' liability policy, but also in what amount such acts would have been covered. As such, they had presented no evidence "on the crucial issue of exactly what a directors' and officers' policy, if issued, would or would not cover." As such, the Eleventh District concluded that Kelley's motion for a directed verdict should have been granted. *Id.*

{¶ 101} In our view, *Warren Star* is distinguishable from Trent's case. As the trial

court noted, although "a plaintiff need not prove the precise amount of damages, a plaintiff must present evidence that brings the extent of the damages alleged outside the realm of conjecture or speculation." DeMange's May 27, 2022 notes reflected the specific coverage that Trent sought, and the proposal reflected that White Pine contemplated providing such specific coverage. In other words, there was not a complete absence of evidence herein as in *Warren Star*. Accordingly, the trial court erred in concluding that Trent's negligent misrepresentation claim failed on the issue of damages as a matter of law.

{¶ 102} Further, construing the evidence most strongly in favor of Trent, genuine issues of material fact exist regarding whether DeMange supplied false information in advising him when, after having obtained specific information from him, she stated that coverage was "handled." There is also a genuine issue of material fact as to whether Trent was justified in relying on DeMange's statement. In other words, it is for a jury to determine whether DeMange exercised reasonable care and competence in obtaining and communicating information to Trent, or if she misled him. Accordingly, Trent's second assignment or error is sustained.

{¶ 103} Trent's third assignment of error is as follows:

THE TRIAL COURT ERRED IN CONCLUDING THAT [PHELAN INSURANCE] WAS NOT VICARIOUSLY LIABLE FOR DEMANGE'S NEGLIGENT ACTS AND/OR OMISSIONS.

{¶ 104} Trent argues that, because there are genuine issues of material fact as to the underlying claims, there is also a genuine issue of material fact as to whether Phelan

Insurance is vicariously liable for those claims. Defendants respond that, "when an employee accused of wrongdoing has been found to have no liability to the party claiming injury, the employer cannot be held vicariously liable."

{¶ 105} "The acts of an insurance company's general or soliciting agents may bind an insurance company." *Gerace-Flick*, 2002-Ohio-5222, ¶ 85 (7th Dist.), citing *Clements,* 33 Ohio App.3d 80 (1st Dist.) "An insurance company can be held vicariously liable for the negligence of [an agent] under the doctrine of respondeat superior." *Id.*, citing *Whitmore v. Monumental Life Ins. Co.*, 1988 WL 142076, *2 (10th Dist. 1988).

{¶ 106} " 'Respondeat superior' speaks only to the vicarious liability of an employer; it does not simultaneously create an express cause of action against individual agents and servants of the employer. 'Respondeat superior' means '[l]et the *master* answer,' and [has been defined] . . . as the doctrine holding a *master . . .* liable in certain cases for the wrongful acts of his servant, and a *principal* for those of his agent.' " (Emphasis sic.) *Hauser v. Dayton Police Dept.*, 2014-Ohio-3636, ¶ 11, quoting *Black's Law Dictionary* 1546 (3d Ed. 1933). Respondeat superior liability "depends on the existence of control by a principal (or master) over an agent (or servant), terms that [the Ohio Supreme Court has] used interchangeably." *Natl. Union Fire Ins. Co. of Pittsburg, PA v. Wuerth*, 2009-Ohio-3601, ¶ 20. Agency relationships may be created under theories of actual agency, apparent agency, "or by the principal's ratification of the unauthorized acts of another." (Citations omitted.) *Gerace-Flick* at ¶ 86

{¶ 107} Having found that the trial court erred in granting summary judgment in favor of Defendants on Trent's negligence claims, it follows that the trial court erred in

granting summary judgment on Trent's claim for vicarious liability against Phelan Insurance. Trent's third assignment or error is sustained.

## Conclusion

{¶ 108} We find that genuine issues of material fact exist preventing summary judgment on Trent's negligence claims and, by extension, his claim for vicarious liability. Having sustained Trent's assignments errors, the judgment of the trial court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.